People v Ottey (2025 NY Slip Op 51189(U))

[*1]

People v Ottey

2025 NY Slip Op 51189(U)

Decided on July 23, 2025

Supreme Court, Kings County

Petersen, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 23, 2025
Supreme Court, Kings County

The People of the State of New York

against
Marquis Ottey, Defendant

Indictment No. 76832-23

For the defendant: Michael Chessa, Esq.
For the People: Ainissa Proctor, Kings County District Attorney's Office

Kim Petersen, J.

The defendant is charged with one count each of attempted murder in the second degree (Penal Law §110/125.25[1]), and other related crimes. 
On September 4, 2024, the People consented to a Mosley hearing. The subject of the Mosley hearing related to the identification made by Police Officer Richard Rodriguez of the defendant from a video recording. 
The court conducted a Mosley hearing on February 18, 2025, and April 11, 2025, with respect to these identifications. At the hearing, Police Officer Rodriguez and Detective Siljkovic testified on behalf of the People. The People introduced two video files. One video file was from 118 McKinley Avenue which Detective Siljkovic sent to Police Officer Rodriguez. The other video file was from 110 McKinley Avenue. I find the witness' testimony credible and make the following findings of fact and conclusions of law.
(I)
FINDINGS OF FACT
Police Officer Rodriguez has been employed by the New York City Police Department for over two years and has been assigned to the 7th precinct for that entire time. Over his career, he has made over 80 arrests.
Between late October through early November 2023, Police Officer Rodriguez received a telephone call and an e-mail to his police department e-mail address from Detective Siljkovic about a shooting that occurred on October 22, 2023, at 108 McKinley Avenue. In that communication, Police Officer Rodriquez was asked to view a video recording from 118 McKinley Avenue and whether he recognized anyone. After viewing the video recording, Police Officer Rodriguez recognized Marquis Ottey and informed Detective Siljkovic. 
In September 2023, Police Officer Rodriguez had encountered Marquis Ottey during a car stop at East Broadway and Clinton Street which lasted about 10 minutes. Police Officer Rodriguez recalled that he approached the driver side of the vehicle, and that Marquis Ottey was seated in the driver's seat. Police Officer Rodriguez also recalled that during the car stop, he was about 12 inches away from Marquis Ottey and was able to view his face without any obstruction.
Police Officer Rodriguez could not remember whether Marquis Ottey was wearing a hat, a jacket or a turtleneck shirt, which may have covered his lower portion of his face. 
Police Officer Rodriguez arrested Marquis Ottey and directed him to exit his vehicle. At that time, Police Officer Rodriguez was standing side by side with Marquis Ottey. Although it was nighttime, Police Officer Rodriguez described the area to be lit. Marquis Ottey was transported to the 7th precinct for arrest processing which lasted about four hours. Police Officer Rodriguez could not recall whether he or his partner handcuffed Marquis Ottey, which vehicle transported Marquis Ottey to the precinct or who transported Marquis Ottey's vehicle to the precinct. 
During the arrest processing by Police Officer Rodriguez, Marquis Ottey, was not wearing a face covering and was situated anywhere from 8 to 30 feet away from Police Officer Rodriguez. Police Officer Rodriguez testified that Marquis Ottey was in the holding cell area within the 7th precinct; the bars of the cell and a clear door separated him from Police Officer Rodriguez, who was seated at a desk outside the cell door. Police Officer Rodriguez testified that if he stood up from the desk, he could see Marquis Ottey in the cell. Police Officer Rodriguez stated that the lighting condition of the precinct including the cell area was well lit. Police Officer Rodriguez described Marquis Ottey as having dark colored skin, a slim build and was about 5'9" or 5'10" in height. While Marquis Ottey was in the cell area, Police Officer Rodriguez spoke to him a few times. Police Officer Rodriguez could not recall whether he transported Marquis Ottey to Central Booking. 
Police Officer Rodriguez identified the defendant as Marquis Ottey. 
After the video recording from 118 McKinley Avenue was played, Police Officer Rodriguez identified the defendant being present in the video as the male situated at the rear of the vehicle, as the black male wearing a black beanie, black bubble jacket, black pants and white sneakers.
After the video recording from 110 McKinley Avenue was played, Police Officer Rodriguez identified the defendant as the individual situated close to the rear of the vehicle, wearing a black jacket, black sweatpants and white sneakers. 
Detective Siljkovic has been employed by the New York City Police Department for nearly 15 years. She is assigned to the 75th Detective Squad and was the lead investigator of an incident that occurred on October 22, 2023, at 108 McKinley Avenue, Kings County of alleged shots fired. 
As part of her investigation, she downloaded surveillance video from 110 McKinley Avenue and 118 McKinley Avenue. At 110 McKinley Avenue, Detective Siljkovic discovered that this location had two systems and on DVR2, the time stamp was about 11 hours and 57 minutes ahead of real time. On October 22, 2023, Detective Siljkovic downloaded the video from DVR2 from 110 McKinley Avenue. Detective Siljkovic went to 118 McKinley Avenue and found that the surveillance system was about 3 minutes delayed from real time. On October 24, 2023, she downloaded the video from 118 McKinley Avenue. 
Detective Siljkovic stated that she conducted an inquiry of the defendant's arrest history and learned that Police Officer Rodriguez was the last officer to arrest the defendant. 
Detective Siljkovic sent the video from 118 McKinley Avenue to Police Officer Rodriguez to see if the officer recognized anyone from the video. Over the telephone, Detective Siljkovic asked Police Officer Rodriguez whether he recognized anyone in the video and the officer replied that he recognized the male with a clothing description as Marquis Ottey from a prior arrest the officer had effectuated.
(II)
PARTIES' ARGUMENTS
(a)
Defense Counsel [FN1]

Defense counsel contends that on or about October 22, 2023, a shooting occurred near 110 McKinley Avenue in Brooklyn, and that the police obtained surveillance footage from 118 McKinley Avenue and 110 McKinley Avenue. Defense counsel notes that no firearm was recovered from the scene and that no shell casings, ballistic material or eyewitness testimony directly or circumstantially connects the defendant to the shooting.
Defense counsel maintains that Police Officer Rodriguez did not testify as to the date he encountered and arrested the defendant. Defense counsel also maintains that Police Officer Rodriguez could not recall what the defendant was wearing and whether the defendant's face was covered during the car stop. Specifically, defense counsel contends that the officer was only able to observe the defendant through a partial barrier and if the officer stood at his desk.
Defense counsel argues that Police Officer Rodriguez' s viewing the surveillance footage on the morning of the hearing was improper in that the officer had not previously viewed such footage, that the footage was not properly authenticated, and that the prosecutor had not served notice pursuant to CPL 710.30(1)(b). Defense counsel also argues that the prosecutor did not establish that Police Officer Rodriguez' s identification was independent of his improperly viewing the surveillance footage.
(b)
The Prosecutor [FN2]

The prosecutor contends that Police Officer Rodriguez has a sufficient level of familiarity with the defendant to identify the defendant at trial. The prosecutor asserts that Police Officer Rodriguez testified that he arrested the defendant in September 2023 and that his interaction with the defendant lasted about four hours. The prosecutor notes that while the officer conducted a car stop, Police Officer Rodriguez spent about 10 minutes with the defendant and was able to observe the defendant without any obstruction. The prosecutor also notes that Police Officer Rodriguez stated that the area was lit, and he was about a one foot away from the defendant; and once the defendant [*2]exited his vehicle, the defendant and the officer were side by side. The prosecutor further notes that during the arrest processing at the precinct, Police Officer Rodriguez testified that he was about 5 to 10 yards from the defendant and able to observe the cell area where the defendant was situated.
The prosecutor asserts that at the hearing, Police Officer Rodriguez identified the defendant and upon inquiry as to his recognition, the Officer stated that he was able to identify the defendant from his face. The prosecutor also asserts that at the hearing, Police Officer Rodriquez, while viewing the videos, was able to describe the defendant's actions as depicted in the videos. 
As to the quality of the two videos, the prosecutor maintains that the video from 110 McKinley Avenue is not as clear as the video from 118 McKinley Avenue in that it is blurrier and was captured from a downward angle. The prosecutor argues that Police Officer Rodriguez's testimony is necessary at trial. 
As to the defendant's argument that Police Officer Rodriguez viewed the surveillance footage before he testified at the hearing, the prosecutor contends that Police Officer Rodriguez's basis of knowledge to identify the defendant was his arrest of the defendant. The prosecutor also contends that she established the authentication of the videos through the testimony of Detective Siljkovic. The prosecutor further contends that Police Officer Rodriguez's identification does not require notice under CPL 710.30(1)(b) in that the officer was not an eyewitness to the incident. In any event, the prosecutor asserts that notice was contained in their Notice/Disclosure Form for Initial Discovery dated December 22, 2023, and in an email to defense counsel dated July 31, 2024.[FN3]

(III)
A Mosley Hearing
In People v Mosley, 41 NY3d 640 (2024), police cameras captured a grainy video of a male running through the street and firing three shots into a van. The van drove off and the responding police officers recovered two bullet casings but did not observe the shooter. The initial indictment against the defendant was dismissed and in July 2016, as the prosecutor was preparing to re-present the case against the defendant to the grand jury, the prosecutor showed the video of the shooting to a detective. The detective identified the shooter as the defendant and before the grand jury, the detective identified the defendant as the shooter.
At the trial in February 2018, one of the van's passengers testified that he did not see the shooter and an analyst testified that the bullet casings had not been tested for fingerprints or DNA evidence. The video was the sole evidence connecting the defendant to the shooting. The prosecutor played the video and intended to present the detective, as a lay non-eyewitness, that he believed the defendant to be the shooter depicted in the video. 
At a hearing held outside the presence of the jury, the detective testified that he met the defendant on January 5, 2016, when the defendant was brought to the precinct as a suspect in an unrelated crime. The detective testified that he knew the defendant for
1 ½ years. The detective testified that he had sat in rooms with the defendant, walked side by side with the defendant and had the occasion to speak with the defendant. The detective also testified that he had viewed both, police-related and Facebook photographs of the defendant. Although the detective estimated that he had been in the same room with the defendant on "a number of occasions," he only recalled one specific date, January 5, 2016, as the first date he recalled seeing the defendant face to face. The detective could not recall having any street encounters with the defendant and when he identified the defendant in July 2016 as the shooter in the video, he knew that the defendant had been arrested for a "shots fired and weapons charge." 
Based upon this testimony, the trial court found that the detective had "an extensive basis of knowledge" to identify the defendant as the shooter. Before the jury, the detective testified that he met the defendant about seven months after the video was captured during his routine canvas of the area where the shooting occurred; he knew the defendant for 1 ½ years; he interacted and walked with the defendant and had spoken to him on a couple of occasions. The detective also testified that he was familiar with the defendant's body language and his body type and build.
After viewing the video, the detective identified the defendant as the shooter. The detective acknowledged that at the time of the shooting, he did not know the defendant or what he had been wearing that day. The detective testified that he identified the defendant as the shooter based upon his interactions with the defendant, the defendant's build and the shape of his nose and that the detective was able to use the zoom feature on the video. The detective also acknowledged that when shown screen shots of the video, the defendant's face was a blur, and his nose was not visible. The detective stated that the defendant's appearance had not changed and that his appearance at trial was the same as he appeared in the video he viewed.
During their deliberations, the jury requested to view the video and a readback of the detective's testimony. The jury convicted the defendant.
On appeal, the Court noted that they previously considered the admission of lay non-eyewitness identification testimony and in both cases, permitted such testimony [*3]because sufficient testimony was elicited as to the witness' familiarity with the defendant and that the defendant's appearance had changed between the crime and trial or that the defendant had worn a disguise. 
The Court also noted that surveillance videos and private cameras and video recording devices are now so widespread, "lay opinion identification testimony has become an increasingly common form of evidence (citations omitted)." (Id. at 646) The Court advised that "courts must be vigilant that the testimony does not unnecessarily invade the jury's role (citations omitted)." (Id. at 647)
The Court stated:
"Whether the probative value of such identification testimony outweighs these drawbacks is a decision committed to the sound discretion of the trial court, and reviewable by this Court for abuse of discretion. As we held in Russell, the relevant question is whether the proffered testimony 'serve[s] to aid the jury in making an independent assessment regarding whether the [person in the surveillance footage] was indeed the defendant' (79 NY2d at 1025, 584 N.Y.S 2d 428, 594 N.E.2d 922). To answer in the affirmative, there must be 'some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury' (citations omitted)." (Id.)
The Court held that the court should apply a totality of the circumstances test considering whether the witness is familiar enough with the defendant and whether the testimony would be helpful and necessary. The Court provided a framework for a court to determine whether the non-eyewitness may testify that the person depicted in the video or photograph is the defendant.
The Court held:
"[f]irst, the court must determine whether 'the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful' (citations omitted). 'If the witness lacks familiarity, it is the province of the jury to draw [its] own conclusions regarding the identity of the person depicted without the witness' assistance' (citation omitted), and that is the end of the inquiry.
In making this assessment, courts may consider the witness's general level of familiarity with the defendant's appearance (citations omitted), and whether the witness's familiarity spanned an extended period of time and variety of circumstances (citations omitted). Courts may also take into account whether the [*4]witness was familiar with the defendant's appearance at the time the surveillance footage was taken (citations omitted). Also relevant is the witness's familiarity with the defendant's customary manner of dress or clothing on the day of the surveillance footage (citations omitted). Along similar lines, courts should also consider whether the witness references a specific trait the defendant has (such as a distinctive gait, scar, or tattoo), and importantly, whether they identify that trait in the surveillance footage (citation omitted).
The second consideration is whether the jury needs the witness's assistance (citations omitted). Here, courts should consider whether the defendant's appearance changed between the time of the surveillance footage and the trial or whether the defendant disguised himself in the surveillance footage (citations omitted). In addition, courts may consider the quality of the surveillance footage and the extent to which the subject is clearly captured in the frame (citations omitted). Where an image is clear enough —- that is, not so crystal clear that the jury could identify a person as capably as any witness, and not so obscure that no witness could readily identify the individual
this factor may weigh in favor of admission." (Id. at 648-650)
(IV)
CONCLUSIONS OF LAW
(a)
The Introduction of Police Officer Rodriguez's Identification of the Defendant as Depicted in a Surveillance Video
(i)
Did Police Officer Rodriguez have sufficient contact with the defendant to achieve a level of familiarity that renders his lay opinion helpful?
A review of the relevant caselaw is instructive. In People v Ruiz, 84 Misc 3d 848 (Sup Ct, Kings County 2024), the court found that the police witness was sufficiently familiar with the defendant but that there was no reason to believe that the jury might require assistance in making their own independent assessment that the person depicted in the video was the defendant. In Ruiz, the police witness knew the defendant for 8 years and during that time, they had 5 telephone conversations and 10 face to face conversations, one of which lasted 30 minutes. The police witness testified that he recognized the defendant from his nose, hair, the shape of his face and his gait.
In People v Briggs, 84 Misc 3d 866 (Sup Ct, New York County 2024), the court found that the police witness was sufficiently familiar with the defendant and that there was reason to believe that the jury might require assistance in making in its independent assessment that the person depicted in the still images was the defendant. In Briggs, the police witness spent five minutes outside on the street with the defendant while arresting him and spent two hours processing the defendant's arrest. The police witness stated that during the arrest processing, the defendant sat a few away and that he fingerprinted and photographed the defendant. The police witness also described the defendant's physical appearance including that he had distinctive tattoos. The police witness further stated that the person depicted in the still images was wearing the same coat that the defendant was wearing on the day of his arrest. 
In People v Robbs, 233 AD3d 1456 (4th Dept 2024), the court found that the police witness' identification of the defendant as the shooter in the surveillance video was an abuse of discretion but a harmless error. At the suppression hearing, the police witness testified that he had twice interviewed the defendant, drove the defendant to the court three times and sat next to him during court proceedings, all eight years before he viewed the surveillance video. The court found that testimony did not establish that the police witness was sufficiently familiar with the defendant to render his identification helpful to the jury.
In this case, Police Officer Rodriguez spent over four hours with the defendant in September 2023.[FN4]
The officer stated that the stop of the defendant's vehicle and the subsequent arrest of the defendant at the scene lasted about 10 minutes. Police Officer Rodriguez stated that when he stopped the defendant's vehicle and approached the driver side of the vehicle, he was about one foot away from the defendant and that he was able to view the defendant's face without any obstruction. On cross-examination, Police Officer Rodriguez could not recall what the defendant was wearing including whether the defendant had covered his lower portion of his face. Once the defendant was arrested, the defendant exited his vehicle and then was standing side by side of Police Officer Rodriguez. On cross-examination, Police Officer Rodriguez could not remember who had handcuffed the defendant, who transported the defendant's vehicle to the precinct, and which vehicle the defendant rode to the precinct. 
The officer also stated that the remainder of four hours occurred at the precinct while the officer processed the arrest, and the defendant was situated in the precinct holding cell. Police Officer Rodriguez described the distance between the holding cell and the desk at which he completed the arrest was anywhere between 8 to 30 feet. Police Officer Rodriguez was only able to view the defendant in the holding cell if the officer stood up from the desk. Police Officer Rodriguez stated that during the arrest processing, [*5]he spoke to the defendant a few times. No testimony was elicited as to whether Police Officer Rodriguez ever approached the defendant or spoke to the defendant from his desk during the arrest processing. Further, he was never asked the length of time the questioning of the defendant lasted, whether he fingerprinted the defendant or took his arrest photograph.
Based upon a totality of the circumstances, this court finds that Police Officer Rodriguez was not sufficiently familiar with the defendant that his testimony would be reliable and helpful to the jury.
(ii)
Does the jury need the witness' assistance in identifying the person depicted in the video surveillance as the defendant?
Even if this court had found that Police Officer Rodriguez was sufficiently familiar with the defendant to render his lay opinion helpful to the jury, this court would have found that jury did not need his identification that the person depicted in the video was the defendant. 
Based upon a review of the two video files introduced at the hearing, the images captured on the video files are clear and unobstructed. In the video files which depicts the incident from two different angles, one can observe the defendant's clothing, actions and facial features which were captured over an extended time as he conversed with others and allegedly displayed and used a firearm. The defendant was not disguised. The prosecutor did not present testimony that the defendant's appearance has changed since the incident. This court notes that Police Officer Rodriguez testified that the video was clear, not overly blurry and nothing obstructed his view of the defendant.
Even if this court had found sufficient contact between Police Officer Rodriguez and the defendant to warrant a level of familiarity, given the quality of the video files, the jury would not need the assistance of Police Officer Rodriguez in determining whether the person depicted in the video files is the defendant.
(b)
Improper Viewing of a Surveillance Video
Police Officer Rodriguez testified that before the hearing commenced, he viewed a surveillance video that he had not previously viewed. Defense counsel has argued that the Officer's identification tainted his identifications of the defendant at the hearing. 
This court disagrees. The scope of the hearing was whether Police Officer [*6]Rodriguez "has had sufficient contact with the defendant to a achieve a level of familiarity that renders the lay opinion helpful." (People v Mosley, 41 NY3d 640, 648 [2024] quoting People v Russell, 165 AD2d 327, 329 [2d Dept 1991], affd 79 NY2d 1024 [1992]) As the Court of Appeals stated in Mosley, in determining this assessment, a factor to be consider by the court is "whether the witness was familiar with the defendant's appearance at the time the surveillance footage was taken (citations omitted)." (Id.) Moreover, the Court of Appeals stated that although the police witness testified that he had viewed both police-related and social media photographs of the defendant, this was "not a proper basis for familiarity." 
As guided by the Court of Appeals, the subsequent viewing of another surveillance video before Police Officer Rodriguez testified was not considered in this court's assessment regarding the sufficient level of familiarity by Police Officer Rodriguez of the defendant.
Improper Authentication of the Surveillance Video and Lack of Notice
Defense counsel has argued that the surveillance video shown to Police Officer Rodriguez before the hearing commenced was not properly authenticated and that the prosecutor has not served and filed notice under CPL 710.30(1)(b) of the identification of the defendant made by Police Officer Rodriguez after viewing such video.
In this case, the surveillance video that was shown to Police Officer Rodriguez was subsequently authenticated by testimony from Detective Siljkovic and introduced into evidence at the hearing. 
As to the lack of notice regarding Police Officer Rodriguez's identification of the defendant made after viewing such video, notice under CPL 710.30(1)(b) is not necessary. As the court stated in People v Smalls, 78 Misc 3d 1227(A)(Sup Ct, Queens County 2023), "[t]he observations of the defendant in the surveillance tape is not an identification of the defendant as the perpetrator of the crime, subject to C.P.L. §710.30 notice, but the lay witness's opinion concerning the individual's identity in the video."
(V)
CONCLUSION
The People's motion to introduce testimony from Police Officer Rodriguez, that the person depicted in the surveillance videos is the defendant, is denied.
This constitutes the decision and order of the court.
Date: July 23, 2025
Kim Petersen, A.J.S.C.

Footnotes

Footnote 1:On or about May 27, 2025, defense counsel filed an Affirmation in Support of his Motion to Preclude Officer Rodriguez's testimony.

Footnote 2:On or about June 27, 2025, the prosecutor a Memorandum of Law.

Footnote 3:The prosecutor submitted copies of both document as exhibits to her Memorandum of Law.

Footnote 4:No testimony was elicited as to the date of the arrest made by Police Officer Rodriguez.